Nott, J.,
dissenting:
The term interest covers two distinct things — compensation for the use of money by express agreement; damages' allowed by law for the nonpayment of a debt after it has become due. It is the latter which is prohibited in this court in suits against the Government by the Revised Statutes, section 1091.
As to the ürst item of money expended in the payment of interest upon the bonds of the State which were sold to raise money for the General Government, I concur in the opinion of *504 my brother Weldon. As to the second item, of money expended in the payment of interest upon a loan obtained from the canal commissioners for the use of the Government, I dissent.
The grounds upon which I dissent are: First, that in order to shield the defendants from making good this loss it is necessary to hold that a State government can do an unconstitutional act; or, to express it differently, that the unconstitutional act of State authorities must be deemed the act of the State itself; second, that a substantial loss has been incurred hereby the claimant, which the defendants are in honor and good conscience bound to make good, and the intent of the act of indemnity is that the loyal States, which acted on behalf of the General Government during the civil war, shall be reimbursed and made whole; third, that the restriction of the Eevised Statutes (§ 1091) prohibiting the recovery of interest as damages in suits against the Government is not applicable to this case, inasmuch as the contract loaning the money expressly provides for the payment of interest, and was ratified by the acceptance of the money and the payment of the principal.
In the application of the act of indemnity to the case, the initial fact of the transaction must be borne in mind. The State of New York was not a corporation whose business was to raise and equip troops for any Government that chanced to be engaged in a civil war, but, on the contrary, the President of the United States, in the awful crisis of the hour, went to its officers and asked that the resources of the State be given in aid of the General Government. The legislature was not then in session, and the State officers had no authority, constitutional or legal, to pledge the credit of the State or involve it in financial liability. From motives of the highest patriotism they assumed an enormous responsibility, and proceeded to act on behalf of the General Government. But in their action they were not the agents of the State, nor acting on its behalf, nor assuming to promote its interest. If they were anybody’s agents, they were the agents of the General Government, and for their unauthorized acts the General Government is in law and morals and under the terms of this act of indemnity bound to make good the losses which the unauthorized acts of these officers caused the State.
This, then, being the status of the parties, the governor and *505 comptroller proceeded to borrow money, not for tbe use and benefit of the State nor by its authority nor at its request, but for the use and benefit and at the request of the General Government. They borrowed from two sources, from ordinary lenders who had money to invest, by selling them the interest-bearing bonds of the State, and from a board of trustees known as the commissioners of the canal fund, who had moneys in their hands to loan on interest-bearing securities and only on interest-bearing securities. In course of time these loaus matured, and the State assumed and paid them, principal and interest. The General Government, under the act of indemnity, has paid the principal which the State expended for its use, but has refused to pay the interest.
When the General Government requested the State officers to act in its behalf they might have proceeded in one of three different ways. They might have bought the military supplies on an indefinite credit, and «allowed the vendor to add the unknown and undetermined interest to the price; they might have purchased by contracts bearing interest, which would run until the price should be paid by the General Government; they might have borrowed monéy on interest and bought the goods at the lowest price for cash. As to the first method, there can be no question that if it had been pursued the Government would have been liable for the price paid. As to the second method, there can hardly be a question as to tbe Government’s liability for both principal and interest- As to the third method, it is the one which has occasioned the controversy of the present suit. Yet from a business point of view the first method was the worst, and the third, as every man of business knows, was the best. The eminent merchant who was then the governor of the State proceeded as he would have proceeded for a brother merchant. He raised the money and went into the market and purchased at the lowest cash price.
The money which the State of New York, through its officers, thus expended at the request and for the use of the United States was not in its own treasury, but was procured from two sources:
First, the State issued and sold its own bonds, bearing 7 per cent interest. The General Government lost nothing by that. The credit of the State was better than the credit of the General Government, and a saving was effected by the State loan *506 ing its own credit for the proenrement of the necessary funds. It was able at that time both to buy and to borrow on better terms than the principal for whom it was acting. It has charged nothing for the use of its credit thus loaned, and is merely seeking to be repaid the money which it expended.
The second source from which money was procured for the use of the United States was the canal fund of the State of New York. This fund was, so far as the State was concerned, a sinking fund for the reduction of a public debt; but it was also an interest-bearing trust fund, pledged to a designated class of creditors. I emphasize the statement that it was an interest-bearing fund; for it was in no sense an accumulation of idle money in one of the coffers of the State, but was in fact and in contemplation of law a mass of interest-bearing securities held and accumulated for the future liquidation of a specific debt, and was at the same time pledged to the holders of the debt. The commissioners ®f the fund had no right to hoard the money which came to their hands, and had no right to loan it without interest. The scope of their duties was to invest, and to invest at interest, and the purpose of the fund, the chief, if not the sole purpose, was that money from time to time accumulated for the extinction of the canal debt should not lie idle in the treasury of the State, but should be invested in securities which would yield, until the debt matured, that profit which we call interest.
If the State had issued more bonds than it did for money wherewith to serve the General Government, and the canal commissioners had gone into the market and bought these bonds, the circumlocution would doubtless have saved the State from the delay and vexation which beset this branch of the case, and would have made plain to all minds that the State had incurred obligations and loaned its credit and paid interest, not for its own use or benefit, but for the use and benefit of-the General Government. Yet this circuity of procedure would not have made the State any better off or the General Government any worse. The principle which would have governed and the result which would have been reached would have been the same.
If this charge of interest had been a mere act of the State officers, whereby the State made interest which otherwise it would not have made, the charge would be in the nature of a *507 profit and beyond the scope of an instrument of indemnity. But in the actual case before the court the canal fund existed long before the General Government came to the State as a borrower. It had been created and was regulated by the constitution of the State. Whoever got money from the canal fund must take it on. the terms prescribed by the constitution. Neither the State officers nor the State legislature nor the General Government nor any power known to our constitutional system could take it upon any other.,terms or authorize it to be taken. Neither could it be applied to any purpose or business of the State; and whatever might be received from a loan in' the way of interest, did not go into the treasury of the State, but returned to the fund. The State itself had no power over the canal fund. Undoubtedly the State was directly interested in the fund as a public debtor, and undoubtedly the legal title to the fund was vested in the State; but beside the State was another party equally interested in the fund, the public creditors, who had loaned money upon the faith of it, and who were in law a cestui que trust and in equity the owners of the fund.
Accordingly, when the governor and comptroller of the State, who were practically acting as agents of the United States, sought a loan from the canal fund, to be expended for the uses and purposes of the General Government, they proposed and agreed to the constitutional condition of interest, and expressly agreed that the loan should bear interest at the rate of 5 per cent. The canal commissioners had no authority to make the loan without interest, and they did not assume to do so; and the State subsequently recognized the obligation which it owed to its creditors, and paid the interest on this specific loan out of money raised by taxation ; that is to say, the taxpayers of New York made good to the canal fund the interest which would otherwise have been realized from ordinary securities ; but the United States have not yet reimbursed them for the taxes that both in form and in fact were devoted to that purpose. These are in brief the ultimate facts of the transaction. The question of law involved is whether the act of indemnity extends to them.
The act of indemnity is not a statute to regulate the purchase of supplies or to restrict the compensation of purchasing agents. If the State of New York had been a merchant selling goods *508 for the sate of profit, or a commission merchant rendering service in consideration of a percentage, it would bave to take the profits or losses which legally resulted. But the State rendered its service gratuitously; it had nothing to make, and as the result proves a risk to bear, and it acted at the request of the Government. The obligation which would rest upon an individual in such a case would be to make the other party whole, and it would be an obligation of the strongest character — legally, equitably, morally. The General Government has recognized this obligation and has passed this act of indemnity. The purpose of an act, as of an instrument, of indemnity is to make the injured party whole. It is not a grant; it is not one of thóse statutes m which doubtful words or phrases are to be strictly construed; an interpretation which leaves the injured party without the indemnity which he ought to have is an interpretation which fails to carry into effect the confessed purpose of the statute. If an individual or a body corporate had accepted the fruits of the loan and recognized the transaction by paying the principal, his acts would constitute a binding ratification. The act of indemnity must surely be as broad as the legal obligations of the United States.
As has been said, the State was called upon to act for the General Government, and acted by borrowing money to raise and equip troops. All of this money was expended in the business and on behalf of the United States. Some of it was borrowed from ordinary lenders, by the. State selling its own bonds; some of it was borrowed from a trust fund, of which the State was the trustee. When the interest on the bonds became due the State took the money of its taxpayers and paid it. When the interest on the other loan became due the State likewise took the money of its taxpayers and paid it also. To that extent the taxpayers of the State are just so much the worse off than they would be if the State officers had never touched the trust fund and borrowed from it for the use of the General Government. Both in form and in substance this interest was money paid. In form, the transaction complies with the terms of the act of indemnity; in substance, the distinction between interest lost and interest paid is too refined to be applied against the purpose of the statute.
And this distinction necessarily rests on the constructively illegal action of the State officers. That is to say, if the cus *509 todians of the fund acted in a constitutional and legal manner by loaning tbe trust moneys in tbeir charge to the United States through the intermediation of the governor and comptroller of the State at an agreed rate of interest, the refunding of the interest was an expenditure for the use of the Government 3 but if they acted in an unconstitutional and illegal manner, by diverting, misappropriating, or misapplying the trust fund to State purposes, then the State can not make money out of the transaction, and the General Government is not liable.
Scofield, J., was absent when this case was argued and took no part in the decision.